Electronically Filed
Intermediate Court of Appeals
CAAP-14-0000737
30-APR-2015
08:21 AM

CAAP-14-0000737

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

DERRICK SMITH, Petitioner-Appellant,
v.
STATE OF HAWAI'I, Respondent-Appellee.

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(S.P.P. NO. 10-1-0007 (FC-CR NO. 03-1-0027))

MEMORANDUM OPINION
(By: Nakamura, C.J., and Leonard and Reifurth, JJ.)

Petitioner-Appellant Derrick Smith (Smith) was convicted in 2004 of second-degree murder of his infant son. In 2010, Smith sought post-conviction relief pursuant to Hawai'i Rules of Penal Procedure (HRPP) Rule 40 (2006). After Smith was appointed counsel for the HRPP Rule 40 proceeding, Smith clarified that his HRPP Rule 40 petition sought relief on the sole claim of ineffective assistance of his trial counsel. In particular, Smith asserted that his trial counsel provided ineffective assistance in failing to call an expert to contradict the medical examiner's testimony that fatal-accident falls are extremely rare for children due to their more pliable/resilient skulls. After holding a hearing, at which Smith's trial counsel testified, the Circuit Court of the First Circuit (Circuit Court)[1] denied Smith's petition. The Circuit Court concluded

---

[1] The Honorable Karen S.S. Ahn presided.

that Smith had waived his claim of ineffective assistance of counsel by failing to raise it in a federal habeas corpus petition he previously filed. It further ruled on the merits that Smith had failed to show that his trial counsel provided ineffective assistance.

Smith appeals from the Circuit Court's "Findings of Fact, Conclusions of Law, and Order Denying Amended Rule 40 Post-Conviction Relief Petition" (Order Denying Petition) filed by the Circuit Court on March 7, 2014. On appeal, Smith contends that the Circuit Court erred in concluding that: (1) he waived his claim of ineffective assistance of counsel by failing to raise it in his prior federal habeas corpus petition; and (2) his right to effective assistance of counsel was not violated. As explained below, we conclude that Smith failed to demonstrate that his trial counsel provided ineffective assistance, and we affirm the Order Denying Petition on that basis.[2]

BACKGROUND

I.

Respondent-Appellee State of Hawai'i (State) charged Smith with second-degree murder for intentionally or knowingly causing the death of his eight-week-old son, Kelbey. Smith was represented at trial by Deputy Public Defender Ronette Kawakami (DPD Kawakami).

Smith was watching Kelbey alone when the baby sustained fatal head injuries. Smith's defense was that he had accidently dropped the baby. The State presented evidence that Smith gave several different versions of how he claimed the baby had been injured. At trial, the State called Dr. Kanthi Von Guenthner (Dr. Guenthner), the Medical Examiner for the City and County of Honolulu.

---

[2] We note that Respondent-Appellee State of Hawai'i concedes that the Circuit Court erred in concluding that Smith waived his ineffective assistance of counsel claim by failing to raise it in his federal habeas corpus petition. However, in light of our decision that the Circuit Court properly denied Smith's ineffective assistance of counsel claim on the merits, we do not address the Circuit Court's ruling on waiver.

Dr. Von Guenthner testified that in performing the autopsy on the baby, she found a "constellation of injuries," including a fracture of the parietal bone on the top of the baby's head, a fracture of the right orbital bone, a torn nose, bruising to the right and left upper and lower eyelids, retinal hemorrhaging, and bruising to the chin, back, and shoulders. Dr. Von Guenthner opined that the baby died of "severe head injuries sustained as a result of abusive trauma which was non-accidental." Dr. Von Guenther did not believe that the baby's injuries could be explained by a face first fall onto a hard surface from three or four feet. Dr. Von Guenthner based this opinion on the multiple different injuries observed on the baby and her experience that it was extremely rare for babies to die from that type of fall. Although acknowledging that she was not an expert in biomechanics and therefore did not "have the numbers," Dr. Von Guenthner explained that "[w]e don't see too many deaths" when babies fall because a baby's "skull is pliable and thin and can absorb force" and "is resilient."

DPD Kawakami, Smith's trial counsel, sought to cross-examine Dr. Von Guenthner with information contained in an article published in a medical journal that was authored by Dr. John Plunkett (Dr. Plunkett), which disagreed with the prevailing view that short-distance falls do not result in fatal injuries to children. The State moved in limine to preclude such cross-examination, arguing that the proper way to get the information in the article before the jury was to call the author of the article. In response, DPD Kawakami argued: "Sure, in a perfect world, yeah, we could fly Dr. Plunkett in from Pennsylvania; but this is not a perfect world, and we can't do that." DPD Kawakami also argued:

> If the Court is disinclined to allow [the cross-examination requested by the defense], then we're going to ask for a recess of the trial so that we could ask the Court to fund bringing in a mainland witness because we do not have the funds to bring in a mainland witness like this. I don't even know if he will come. But the witnesses here would not -- there's no one here with this kind of expertise, not in Hawai'i.

3

The Circuit Court granted the State's motion in limine and precluded Smith from cross-examining Dr. Von Guenthner about Dr. Plunkett's article.

The jury found Smith guilty as charged of second-degree murder. The Circuit Court sentenced Smith to life imprisonment with the possibility of parole and also imposed a mandatory minimum term of fifteen years of imprisonment.

## II.

Smith, who continued to be represented by the Public Defender's Office, appealed his conviction. On March 28, 2006, the Hawai'i Supreme Court issued a summary disposition order affirming Smith's conviction. Smith subsequently filed a federal habeas corpus petition. The petition was denied in 2007, and this denial was affirmed on appeal in 2008.

## III.

In 2010, Smith sought post-conviction relief pursuant to HRPP Rule 40 in the Circuit Court. In support of his claim of ineffective assistance of trial counsel, Smith submitted two affidavits from Dr. Plunkett, a board certified pathologist, in which Dr. Plunkett stated, among other things that: (1) he reviewed materials provided by Smith's HRPP Rule 40 counsel, including the Medical Examiner's investigation and autopsy reports and Dr. Von Guenthner's trial testimony; and (2) based on his review of the materials, it was his opinion that (a) a closed-head injury caused Kelbey's death; (b) Kelbey had at least four scalp bruises, each indicating a separate impact; (c) accidentally dropping a pre-mobile infant from a height as little as 2-3 feet may cause a skull fracture and result in severe injury or death; (d) however, Kelbey did not have a single impact injury, but had three other scalp bruises as well as bruises on both sides of his posterior thorax, both arms, upper lip, and forehead; (e) while an accidental drop may have caused the left parietal impact and its sequale, none of the descriptions of the incident that Smith provided account for Kelbey's additional injuries; (f) except for the parietal scalp contusion, Dr.

4

Plunkett is unable to determine when the other bruises occurred because there are no slides showing the microscopic examination of these other bruises; and (g) the only way to determine accurately when these other bruises occurred is to examine them microscopically, and he considers the failure to examine microscopically any of the bruises other than the parietal scalp bruise to be "a departure from the standard of care." Dr. Plunkett also asserted that (1) Dr. Von Guenthner incorrectly testified that more force is necessary to fracture the skull of an infant than that of an adult; (2) in 2003, his "opinion that children could suffer fatal injuries in short-distance, accidental falls was a 'minority opinion' that was not the prevailing view"; and (3) he did not recall being contacted by Smith's trial counsel.

At a hearing on Smith's HRPP Rule 40 petition, DPD Kawakami[3] testified that the defense theory at trial was that Smith had accidentally dropped the baby. Smith informed DPD Kawakami that he did not believe that anyone else, such as his girlfriend (Kelbey's mother), could have caused the baby's injuries, and DPD Kawakami did not have any evidence that someone besides Smith had caused the baby's death. Smith had provided three different versions of what had happened: (1) he was carrying the baby like a football, when the baby slipped out of his hand and fell to the floor, hitting the baby's head; (2) the baby fell out of Smith's hand, hit Smith's knee, then hit the floor; and (3) the baby hit a doorknob as Smith was walking.

DPD Kawakami testified that in preparing for trial, the defense looked for a medical examiner expert that could help with Smith's case, but could not find one in Hawaiʻi. DPD Kawakami was assisted by Alen Kaneshiro (Kaneshiro), who at that time was an intern with the Public Defender's Office. The defense used the internet to search for a mainland expert. In scouring sites

---

[3] By the time the HRPP Rule 40 hearing was held, Ms. Kawakami no longer worked at the Public Defender's Office. However, for simplicity, we will continue to refer to her as "DPD Kawakami."

that had medical journals and articles, they came across and obtained an article written by Dr. Plunkett. DPD Kawakami testified that a problem, however, with Dr. Plunkett's article was that it had not been peer reviewed, which raised questions about its reliability.[4]

DPD Kawakami testified that she had several concerns about calling Dr. Plunkett as witness for the defense, including: (1) his article was not peer reviewed; (2) her research revealed that his opinion regarding whether a short-distance fall could case a baby's death was distinctly a minority view; and (3) if the defense called Dr. Plunkett as an expert witness, the State could cross-examine him on the different versions Smith had given on how the baby had been injured, which "would have hurt us and would have looked pretty bad." DPD Kawakami was particularly concerned about the risk that calling Dr. Plunkett as an expert witness would have a negative impact on Smith's case because she believed they had enough evidence to mount a credible defense. She explained that Smith was tall, which would increase the distance of the baby's fall, and there was substantial evidence negating criminal intent, including that Smith called 911 to report that the baby was unresponsive, he was performing CPR on the baby when the paramedics arrived, and Smith had been the person able to soothe the baby in the past. DPD Kawakami further explained that if she designated Dr. Plunkett as an expert witness, the State could interview him and discover information that could help the State's case and hurt Smith.

When asked whether "financial reasons or cost [was] ever an issue in terms of calling Dr. Plunkett as a witness at trial[,]" DPD Kawakami responded:

---

[4] Dr. Plunkett asserted in an affidavit submitted after DPD Kawakami had testified at the HRPP Rule 40 hearing that two articles he published in 1999 and 2001 in the American Journal of Forensic Medicine and Pathology had been peer reviewed by the editors of the journal. However, in her argument on the State's motion in limine at Smith's trial, DPD Kawakami referred to an article written by Dr. Plunkett that was dated June 2004. The parties do not clarify whether the article DPD Kawakami referred to in her testimony at the HRPP Rule 40 hearing was one of the articles Dr. Plunkett referred to in his affidavit.

Financial issues, if we had or -- and let me explain. The deputy public defender's office of course has limited resources, unquestionably. However, if we need an expert and the expert was someone who was going to be completely beneficial to us, we would pay for it, and we have done it in the past, spent large amounts of moneys for experts, but it was only where experts, we knew that their testimony would be solid, their testimony would be helpful. If the testimony would have been wishy-washy and we were unsure whether it would actually be helpful, then it would not make sense to expend that kind of money. In fact, that expert [(Dr. Plunkett)] might hurt the case, and we didn't want that.

IV.

The Circuit Court denied Smith's HRPP Rule 40 petition. With respect to the merits of Smith's claim that his trial counsel had failed to provide effective assistance, the Circuit Court made the following pertinent findings of fact and conclusions of law:

I. Findings of Fact

1. In June 2004, this Court presided over a jury trial in FC-CR 03-1-0027, wherein Petitioner Derrick Smith ("Petitioner") was charged with the offense of Murder in the Second Degree for the death of his 13-pound, eight-week-old son, . . . ("Kelbey").

. . . .

5. In 2010, Petitioner filed the instant Petition. He originally asserted various bases for the Petition, but in January 2013, through counsel Reginald P. Minn, clarified that he sought relief on one basis only: that he "was rendered ineffective assistance of counsel by trial counsel's failure to retain an expert to review the relevant autopsy report, and to further provide expert testimony to support petitioner's defense that any injury to the decedent caused by Smith was the result of an accident or negligence."

6. At trial, then-chief Honolulu Medical Examiner Kanthi von Guenthner, who performed the autopsy on Kelbey, testified that she found a fracture of the parietal bone on the left top of Kelbey's head, which in turn caused a "fresh" underlying hematoma; a fracture of the right orbital bone; a torn nose, which Dr. von Guenthner said was consistent with impact with a "sharp edge"; bruising to the right and left upper and lower eyelids; retinal hemorrhaging, which can be, but is not necessarily, associated with abuse as opposed to other causes; and bruising to the chin, back, and shoulders. Dr. von Guenthner testified that, based upon all of the circumstances and a "constellation of injuries" on Kelbey, she believed that he died from severe head injuries sustained as a result of abusive trauma which was non-accidental. Dr. von Guenthner said that she did not

7

believe, to a reasonable degree of medical probability, that Kelbey's injuries could be explained by a single accidental fall, or a single fall onto his face. However, Dr. von Guenthner told the jury that a child can fall and sustain "abusive head trauma" or retinal hemorrhaging, but she believed these occasions were "rare."

7. Former State Deputy Public Defender Ronette Kawakami ("Ms. Kawakami"), who represented Petitioner at trial, cross-examined Dr. von Guenthner about her lack of knowledge and failure to apply principles of biomechanics in this case. Dr. von Guenthner appeared to agree with defense counsel that there was a minority in the area of forensic sciences who advocate the use of biomechanics when seeking an accurate determination of a fatal fall. Dr. von Guenthner said she did not apply biomechanical principles in this case but relied upon her "experience."

8. Petitioner gave authorities three versions of what had happened to cause Kelbey to suffer injury. He told an emergency response person that he had been feeding Kelbey when Kelbey fell onto the carpeted floor. Petitioner then told a police officer that he was carrying Kelbey when his arm hit the door, causing Kelbey to fall to the floor. Petitioner then said that his arm did not hit the door, but that he was carrying Kelbey, who wriggled and fell face-first from Petitioner's arm onto the floor.

9. Petitioner, through his current counsel, Reginald P. Minn, offered sworn affidavits by Dr. John Plunkett, a board-certified pathologist, who said that, if called as a witness, he would have testified that the injury to the left top of Kelbey's head caused Kelbey's death, and that "dropping a pre-mobile infant from a height as little as 2-3 feet may cause a skull fracture, subdural bleeding, brain swelling . . . and . . . injury or death." Dr. Plunkett also said Kelbey had numerous bruises to different parts of his body and that "none of the descriptions that Mr. Smith gave to EMS and law enforcement account for these additional injuries." Finally, Dr. Plunkett said that the medical examiner should have prepared microscopic samples from the various bruises because "(t)he only way to determine accurately when these bruises occurred is to examine them under the microscope." In his second affidavit, Dr. Plunkett said he would have testified that, in 2003, his opinion that children could suffer fatal injuries in short-distance, accidental falls was a "'minority opinion' that was not the prevailing view."

10. In preparation for trial, Ms. Kawakami, with the help of an intern, Alen Kaneshiro, reviewed discovery, visited sites, interviewed key witnesses, and spoke with Petitioner about the defenses he wanted asserted and to provide Ms. Kawakami with his perception of what had happened. Ms. Kawakami spoke with Petitioner about whether anyone else could have been responsible, but Petitioner did not think it could have been Kelbey's mother. The defense's final trial theory was that Petitioner had dropped Kelbey accidentally. There being no evidence to the contrary, Ms. Kawakami searched for a former Hawaiʻi doctor who was alleged to have done some experimentation with falling babies, but found he had passed away. Ms. Kawakami searched

the internet for medical articles about the defense theory and isolated Dr. Plunkett. However, she found two problems with Dr. Plunkett: 1) an article that would have been helpful was not peer reviewed and 2) Petitioner had offered authorities three different versions of what had happened, any of which Ms. Kawakami believed could provide material for cross-examination of her expert and his theory. Ms. Kawakami concluded that Dr. Plunkett appeared to stand alone, or at least in the minority, in his theory, and that others supported Dr. von Guenthner's theory. Ms. Kawakami further testified that, if Dr. Plunkett could be "completely beneficial" to the defense, her office would have funded his appearance as a witness, but that, here, Dr. Plunkett may well have helped, as well as hurt, the prosecution.

## II. Conclusions of Law

1.    In order to succeed on a claim of ineffective assistance of counsel, the court looks at whether defense counsel's assistance was "within the range of competence demanded of attorneys in criminal cases." *State v. Wakisaka*, 102 Hawai'i 504, 514 (2003). Petitioner bears the burden of showing that "there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence" and that "such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense." *Id.* at 516. To satisfy the second prong, Petitioner only need show a possible impairment of a potentially meritorious defense, not probable impairment or actual prejudice. *Id.*

2.    Generally, the decision whether to call witnesses in a criminal case normally is a matter within the judgment of counsel and so will rarely be second-guessed by judicial hindsight. *State v. Richie*, 88 Hawai'i 19, 40, 960 P.2d 1227, 1248 (1998).

.  .  .  .

5.    .  .  . [W]ith the help of her intern Alen Kaneshiro, Ms. Kawakami had reviewed all discovery, interviewed witnesses, and talked with her client about what happened, who may be responsible, and what defenses Petitioner wanted to assert. Ms. Kawakami searched for an expert who might support the defense's theory of the case -- that Petitioner had dropped the baby by accident -- and found and investigated Dr. Plunkett. Because of potential reliability questions about his theory and because the prosecution could challenge his theory on cross-examination with Petitioner's three different versions of what happened, Ms. Kawakami decided not to summon Dr. Plunkett as a witness. On the record and these facts, the Court concludes that Ms. Kawakami's assistance was within the range of competence demanded of attorneys in criminal cases, and that Petitioner has not shown the existence of any specific errors or omissions reflecting Ms. Kawakami's lack of skill, judgment, or diligence.

6.    Moreover, both the State and defense put before the jury the possibility that babies can fall accidentally and sustain abusive head trauma and/or retinal hemorrhaging,

9

and that Dr. von Guenthner knew little to nothing about
biomechanical principles as applied to such cases.

(Some ellipsis points in original.)

DISCUSSION

Smith argues that the Circuit Court erred in rejecting
his claim that his trial counsel provided ineffective assistance.
Smith's argument is without merit.

To prevail on a claim of ineffective assistance of
counsel, a defendant bears the burden of establishing: "1) that
there were specific errors or omissions reflecting counsel's lack
of skill, judgment, or diligence; and 2) that such errors or
omissions resulted in either the withdrawal or substantial
impairment of a potentially meritorious defense." State v.
Richie, 88 Hawai'i 19, 39, 960 P.2d 1227, 1247 (1998) (block
quote format and citation omitted). We conclude that Smith has
failed to meet this burden.

Whether to call a witness "is generally a strategic
decision for defense counsel." Id. The Hawai'i Supreme Court
has held that "matters presumably within the judgment of counsel,
like trial strategy, [including the decision on whether to call a
witness,] will rarely be second-guessed by judicial hindsight."
Id. at 39-40, 960 P.2d 1247-48 (internal quotation marks and
citation omitted); State v. McNulty, 60 Haw. 259, 270, 588 P.2d
438, 446 (1978) ("[T]he decision of whether or not to call a
witness in a criminal trial is normally a matter within the
judgment of counsel and, accordingly, will rarely be second
guessed by judicial hindsight."); see Briones v. State, 74 Haw.
442, 463, 848 P.2d 966, 976 (1993) (stating that actions or
omissions of counsel that had "an obvious tactical basis for
benefitting the defendant's case will not be subject to further
scrutiny").

Here, the record shows that DPD Kawakami, Smith's trial
counsel, researched and investigated the possibility of obtaining

10

an expert witness to assist the defense.  After discovering Dr. Plunkett's article, DPD Kawakami considered and weighed the positive and negative impact that retaining and calling Dr. Plunkett as an expert witness could have on Smith's case.  At Smith's HRPP Rule 40 hearing, DPD Kawakami explained why she made the decision not to retain and call Dr. Plunkett as an expert witness: (1) Dr. Plunkett's article, which would have been helpful, had not been peer reviewed;[5] (2) Dr. Plunkett's opinion was distinctly a minority view; (3) the State, through its cross-examination of Dr. Plunkett, would have been able to emphasize Smith's differing versions of how the baby had been injured, which would have hurt Smith's case; (4) the State may have discovered information through Dr. Plunkett that would have bolstered its case; and (5) DPD Kawakami believed they had enough evidence to mount a credible defense and calling Dr. Plunkett could have weakened Smith's case.

We conclude that DPD Kawakami made an informed and strategic decision not to retain and call Dr. Plunkett as an expert witness.  Her decision fell within "the range of competence demanded of attorneys in criminal cases" and did not indicate any "lack of skill, judgment, or diligence" on her part. Richie, 88 Hawai'i at 39, 960 P.2d at 1247 (internal quotation marks and citations omitted).  We decline to second-guess her judgment that calling Dr. Plunkett may have adversely affected Smith's defense, and we conclude that the Circuit Court properly rejected Smith's claim of ineffective assistance of trial counsel.

---

[5] There is an apparent disagreement over whether Dr. Plunkett's article had been peer reviewed.  See note 4, supra.  This apparent disagreement is not material to our analysis of Smith's ineffective assistance of counsel claim. Regardless of whether Dr. Plunkett's article had been peer reviewed, he acknowledged that his opinion was a minority opinion and not the prevailing view at the time of Smith's trial.  Moreover, in this appeal, Smith does not refer to Dr. Plunkett's assertion that his articles had been peer reviewed in arguing his ineffective assistance of counsel claim.

CONCLUSIONS

For the foregoing reasons, we affirm the Order Denying Petition.

DATED: Honolulu, Hawai'i, April 30, 2015.

On the briefs:

Reginald P. Minn
for Petitioner-Appellant

Stephen K. Tsushima
Deputy Prosecuting Attorney
City and County of Honolulu
for Respondent-Appellee

*Craig H. Nakamura*
Chief Judge

*[signature]*
Associate Judge

*[signature]*
Associate Judge

12